191279 Morena-Godoy v. Tansky May it please the Court, I'm John Tansky and I was appointed by this Court to represent the Plaintiff Appellant Luis Felipe Moreno-Godoy. I'd like to reserve three minutes for rebuttal, please. Your Honors, the District Court concluded that it would be hearsay to admit, for the truth of the matter asserted, testimony from Raghda Habal that her husband, Manzur Al-Qasar, told her that their company, Alcaport, owed $100,000 to Mr. Moreno-Godoy. We do not challenge that evidentiary ruling. But what we do challenge, Your Honors, are the next two logical steps that the District Court took to move from that evidentiary ruling to a grant of summary judgment in favor of the defendants. First, the District Court held that Mr. Moreno-Godoy needed to prove that the $100,000 that Ms. Habal wired to Mr. Moreno-Godoy's lawyer, Mr. Cartagainer, belonged to Mr. Moreno-Godoy. And second, the District Court held that without Ms. Habal's testimony, which the Court had ruled inadmissible, there was no admissible evidence left to prove Mr. Moreno-Godoy's ownership. The District Court was wrong in both respects, and each error independently warrants a reversal and a remand for trial. Now I'd like to start with the District Court's legal error first, and then I'll move on to discuss the District Court's error in applying the summary judgment standard to the record in this case. The District Court's legal error was this. Mr. Moreno-Godoy can satisfy the damages element of his breach of contract claim without proving that the $100,000 paid to Mr. Cartagainer belonged to him. Now why do I say that? The law of contracts in the state of New York is clear that an enforceable contract can be formed between promisor and promisee, even if the consideration comes from a third party. The District Court acknowledged this principle, but it held that the principle was irrelevant because consideration and enforceability are not in dispute. But let's dig into that holding for a moment. Recall that damages in a breach of contract case are typically designed to put the plaintiff in the place he would have occupied if the defendant had performed. In other words, the plaintiff gets the benefit of his bargain. And here, the evidence in the record shows that the benefit of Mr. Moreno-Godoy's bargain with Mr. Cartagainer was that he wanted a second set of eyes on the appellate issues in exchange for an all-in fixed fee of $100,000. It's not disputed that Mr. Cartagainer got the fixed fee, and it's also not disputed that Mr. Moreno-Godoy never got the benefit of his bargain because he never got that second set of eyes on his appeal. I don't know if this is dispositive, but what is the value of a second set of eyes? How would one go about calculating the damages for losing that? Did that really harm him? I think, Your Honor, that it's really a question of his peace of mind. And the best analogy I can draw for you here is if you're going in, say, for surgery, and a doctor recommends a certain procedure for you, and you say, before I go under the knife, I want to talk to another doctor, and I just want to make sure that we're going in the right direction. And that second set of eyes there on your medical history has value to you even if the second doctor says, I completely agree with the recommendation from the first doctor. I completely agree with the treatment plan. And so you go forward based on the original recommendation you had gotten. And here, I think, for someone in Mr. Moreno-Godoy's position, someone who was not – Normally, you're calculating expectation damages in a breach of contract claim. I mean is it really available to a party to say, well, I got everything that I wanted in the contract, but I felt badly about how it was executed, and therefore I'm entitled to damages? It's a little odd to think about it that way, isn't it? But he didn't get everything in the contract. The contract is that there would be a second lawyer, and having a second lawyer is a significant issue. But turn to the question of the evidence, because that seems to me the most powerful one. Mr. Godoy said that money should be paid by him, and then he lied or told two different stories. But while those two different stories may be contradictory, that doesn't undercut the fact that he told them to pay money from his money. Why isn't that sufficient evidence? Is that your argument? Yes, Your Honor. I wouldn't agree that he lied, but I understand that there's a potential contradiction in his testimony. So let me address that first, and then let me talk about the evidence that was in the record that would support his ownership. So to begin, as the court's aware, we have to view the evidence in the record in the light most favorable to Mr. Moreno-Godoy. And he's always been very clear about the key facts, that the Alcazar family was in control of money of his, that he asked for that money to be sent to Mr. Cartagena, and that Mr. Cartagena received that money. He didn't know the details of the transaction, and that's why Ms. Habal's testimony was needed. She was a precipient witness to where she got the money and how it was moved to Mr. Cartagena. The point that the defendants have made throughout this case and that the court made was that Mr. Moreno-Godoy was not a precipient witness to those details of where the money came from and how it moved to Mr. Cartagena, which makes sense because he was in prison. And when he made his alibi. Sorry, Your Honor. But why does it matter whether the money came from one source or from another? That may make some difference ultimately, but in terms of whether this money should stay with lawyers who didn't do anything for it, or whether it belongs to Mr. Godoy, or if this money came out of terrorist things, it should be ultimately seized by the government, is not really the issue before us, is it? No, I don't think so at all. I think you're exactly right, Your Honor, that no matter whose money this is, it clearly doesn't belong to Gallet, Dreyer, and Berkey, and it doesn't belong to Mr. Stavis. They had a fixed-fee contract. They got paid that fixed fee, and they shouldn't be holding the extra hundred. You agree that for Mr. Moreno-Godoy's claims other than the breach of contract claim, he would have to show that it was his money? I think for those other claims, yes, that is true. But for the breach of contract claim, I don't think he needs to show that it's his money. He just has to show that there is evidence in the record from which a reasonable jury could find that he suffered damages. And then the point you made earlier, Judge Menasche, really goes to the quantum of those damages. And I think it would be a legitimate argument for the defendants to try to persuade the jury that there wasn't – What's the record evidence that it belongs to Moreno-Godoy? Is it Moreno-Godoy's testimony in the Okana Declaration that say that it was his salary that was being held by Al-Qasar? Is that the evidence? I think there's more evidence than that, Your Honor, but I think you've pointed to the two key pieces of evidence. So I would start with – And my last point that I'd like you to address is I believe the payment was made two years after Mr. Okana left work with the co-defendants' company. Do you want to address, since you put so much weight on the Okana Declaration, whether that's even properly considered here? Yes, Judge Cote, and I'll try to remember to address all of your points. But let's start with your first one, which was about the timing of the Rodriguez-Okana Declaration and then the pretrial order where the witnesses were listed. And what I would say to you there is Mr. Rodriguez-Okana's declaration was submitted in support of a summary judgment filing that was ultimately denied as to both sides. And after summary judgment was denied as to both sides, the parties went forward. They made their pretrial submission under Judge Engelmeyer's individual practices. And in that pretrial submission, you're right that Mr. Rodriguez-Okana was not listed as a witness, but the substance that's in the affidavit and the substance that we're relying on here was represented to the court as being part of the trial testimony that would come from two live witnesses, Mr. Moreno-Gadoy and Mr. Alcazar. And they're both percipient witnesses to talk about the arrangement between them and about the value of the services that Mr. Moreno-Gadoy had provided and the value of compensation. I think you broke up for a second there. You said it was going to be delivered to the two live witnesses. I think you said Alcazar. Who was the other one? The other was Mr. Moreno-Gadoy. So then it ends up being Moreno-Gadoy's own testimony. So Okana is not available to testify? Or you didn't intend to call him as a witness? We did not intend to call him as a witness based on the record and the posture of the case as it stood at the time of that submission. And the court will remember that after that submission, there was the de bene essay deposition of Ms. Habal, and there was the second round of summary judgment, and summary judgment was granted. And I think it would be perfectly appropriate on remand if trial counsel considered it advisable to go back to Judge Engelmeyer and say, now that the situation has changed by virtue of your Honor's summary judgment ruling and whatever the Second Circuit has to say, we'd like to amend that pretrial order. And we'd like to add Mr. Rodriguez-Acaña if they want to do that. But I do think, as I was saying in response to Judge Coates' question, that those facts could certainly come in through Mr. Moreno-Gadoy and through Mr. Alcazar, both of whom are percipient witnesses to the details of their arrangement. And neither one is foreclosed from giving that testimony by what came out in their deposition. And I think the other question that Judge Coates asked was about Mr. Rodriguez-Acaña's personal knowledge. And just to address that quickly, Mr. Rodriguez-Acaña testified that he had knowledge through his work at Alcaport up through 2007, so you're right about that, Judge Coates. And that does leave a bit of a hole between when he stopped and when Ms. Habal made the transfer. However, we're arguing that this is circumstantial evidence, and it's circumstantial evidence that can be considered along with all of the other evidence. There is percipient witness testimony about Mr. Moreno-Gadoy's work for Alcaport, and I don't think that's reasonably disputed. There are also documents in the record, his business card, for example, that establish he was doing work. And all three, Mr. Rodriguez – I'm sorry, Mr. Moreno-Gadoy, Mr. Alcazar, and Ms. Habal all testified about what he was doing for Alcaport. So all of that is circumstantial evidence that demonstrates that he was providing valuable services. We have, in addition, the affidavit from Mr. Rodriguez-Acaña that has the most detail about the particular arrangement that existed between Mr. Moreno-Gadoy and Mr. Alcazar, although I would argue that what Mr. Rodriguez-Acaña has in his declaration isn't at all inconsistent with what Mr. Moreno-Gadoy and Mr. Alcazar testified to. And Mr. Rodriguez-Acaña also put in his declaration. It's not at all inconsistent? I mean, doesn't your complaint state that the $100,000 came from the sale of Moreno-Gadoy's belongings? Isn't that very different than the theory that it was his earned salary? Well, I'm talking about in particular the deposition testimony, and I don't think it's rare for – particularly in a situation like this when it's acknowledged by all sides that Mr. Moreno-Gadoy was not a percipient witness to the details of where the money came from and how it got into Mr. Cartagena's account. That parties will learn things in discovery that provide additional clarity about all of the details of the transaction. I don't think that it does matter, Judge Calabresi. I think you're exactly right to say that a reasonable – with what happens to this money, because if this money came from something that was his, then ultimately it goes back to him. If this money came from some of his money on account of terrorist activities, it may be that the government is able to seize it and get it. But it belongs to that which the government may possibly, on fervor of fact, be able to take it rather than these lawyers. That's your argument, isn't it? You're absolutely right, Your Honor. That is exactly what we're saying here. Well, the district court thought that the money might have come from Alcazar and his wife in order to provide for Alcazar's appeal. And if Alcazar is not a party to this litigation, would Moreno-Gadoy be able – I understand you have a separate argument of breach of contract, but I think you agreed that you couldn't pursue the other claims if the money was not in. But now I think we're repeating arguments. But that's right. You did agree to that. I did agree to that, Your Honor. Yes. Okay. Well, you've reserved time for rebuttal, and I think we're over time, but we'll hear from you again. So let's first hear from the appellees. So let's turn to Mr. Foley. Good morning, Your Honor. This is Jared Foley from Gallatraer & Berkey, and I'm here on behalf of Gallatraer & Berkey and Roger Stavis. So there's a lot to cover, but Moreno-Gadoy, frankly, failed to produce admissible evidence that he was damaged by GDB's purported breach of the retainer agreement, which is an essential element of his contract and quasi-contract claims. Moreno-Gadoy alleges that GDB and Roger Stavis breached their retainer agreement by keeping a $100,000 fee that was actually paid by his co-defendant, Alcazar. But to be clear, we deny any breach. GDB retained payment to represent Moreno-Gadoy on the appeal, a representation that Carter Gaynor could no longer provide because he couldn't obtain security clearance. But let's be clear here. Moreno-Gadoy bears the burden of proof as to each element of his claims, but Moreno-Gadoy couldn't demonstrate damages that the $100,000 actually belongs to him because the allegedly misapplied funds, in fact, came from Alcazar. Now, as an initial matter, Judge Engelmeyer was correct to find that Moreno-Gadoy was obviously… Yeah, but the $100,000 was going to pay for a second lawyer to work on his appeal, right? I think there's some confusion on that, so let me clarify that. Moreno-Gadoy initially retained Roger Stavis to represent him as well as Alcazar in connection with the second circuit appeal. So initially, Roger Stavis, as a partner in GDB, was going to represent both Alcazar and Moreno-Gadoy. And he agreed to do that for a flat fee, right? For the flat fee of $125,000, right? Okay. Then Moreno-Gadoy changed course, and he decided he wanted a different lawyer. And so at the suggestion of Roger Stavis, because he helped him now choose a lawyer, he chose to work with Carter Gaynor. Unfortunately, over the nine months that passed, Carter Gaynor was unable to get a security clearance. At that time, it was on the eve of the due date for the brief, and Roger Stavis needed to take control of things and take over the brief so that he could get in on time and take over the representation of Carter Gaynor. You don't argue anywhere in your briefs that you did anything for that $100,000, do you? I mean, that $100,000 was to be used by a particular lawyer to do certain things, and I don't see anywhere in your brief that you took over and did what that lawyer was supposed to do. So what rights do you have to that $100,000? Actually, respectfully, Your Honor, I disagree. We do say in our brief that Carter Gaynor was tasked to handle certain portions of the brief, because some of it was split up. And so as a result of Carter Gaynor dropping out because he couldn't work on this case, Roger Stavis needed to take over those portions that Carter Gaynor was working on. There's no discussion of the work that he did. I'm sorry. Go ahead. I'm sorry, but even assuming that that's true, he just took the fee that was paid to a different lawyer because he thought that he had done the work? And then was there any agreement with the client that he was going to get this money in exchange for doing the work you just mentioned? I mean, there were discussions following – there were discussions before he took the fee. First off, he spoke with Alcazar, who said that it's – He said he spoke with Alcazar, but then, of course, we have both Moreno Godoy and Alcazar writing to him saying to return the fee, right? They say return the fee to the third party, right? But initially, Alcazar said that Roger Stavis could keep the fee so that he could continue the representation. But why, even if this money was paid by somebody else, wasn't Godoy clearly a third-party beneficiary under New York law? I mean, this money was intended to benefit him, his appeal, and isn't that straight New York law, third-party beneficiary? Somebody pays money for his benefit, and then he's a third-party beneficiary, and if a contract is breached, he can claim. Well, first off, I mean, there's no dispute that we actually performed under the contract, right? Well, the question of whether that – then that would become a different question. That isn't a question on which the district court ruled for you. The district court ruled for you, saying that the money had to have come from Godoy. Now, there's a question about whether there's enough evidence about that and when Godoy said that. But even if there wasn't, wasn't he a third-party beneficiary of a contract that said that he would get something as a result of his money being paid? And whether that happened or not would be a question for trial, but the claim that because it wasn't his money, he can't get to arguing whether he got what was contracted for is a different one. And that's the one on which the court seems to have decided for you, and I don't understand it. Well, I submit that it really doesn't matter whether or not he was a third-party beneficiary, because at the end of the day, he needs to be damaged in order to recover under breach of contract or unjust enrichment. If he didn't get the benefits of the contract, then that's a question of showing how much damage there was. But there is the possibility of damages. If I say I want a lawyer and I don't get a lawyer, I may not be able to show damages, but I've shown enough to get by the initial one. And in any event, the court went on the ground that it wasn't his money, and that's what I don't understand. May I ask, Mr. Foley, did Plaintiff Below argue that he was a third-party beneficiary? Not to my recollection, no. And as to the other point by Judge Calabresi, I want to make the point that there's no dispute that we actually did perform under the contract. Our contract was to represent Moreno-Gadoy on the Second Circuit Appeal. But that contract was for a fixed fee that didn't include the $100,000, right? No, no, that was to represent Alcazar. But then after Cartagena dropped out of the case, we then had to take over the representation. So we were essentially retaining the fee. Let me ask a different question. Suppose somebody says to third parties, use some of my money to pay a lawyer, and then monies are gotten to that lawyer. Is that enough evidence that the money was his to get by summary judgment? That is, is it enough evidence when somebody says, pay out of my money, even though there is no evidence of what money then actually was done? Is that enough evidence? No, Your Honor. I mean, there is no, to my knowledge, if I believe it, therefore it's true, exception to the federal rules of evidence. No, no, I'm not talking about whether the potential hearsay by the person who paid, but if I give an order to pay somebody and that person is paid, is the fact that I gave an order to pay somebody out of my money sufficient evidence that the person was paid out of my money when payment was made? And then there is a question of where that money came from, where there isn't sufficient evidence of where that money came from. But is the fact that I ordered somebody to pay out of my money sufficient evidence that ultimately it was, although we don't know where the money came from? Well, Your Honor, it really depends on the context, because you say an order, right? If you're talking about someone who is, say, answerable to you, right? You say to an employee. Somebody's in jail and says to somebody outside of jail, you have some of my money, pay this guy. No, and especially not under these circumstances. I mean, in the general circumstances, it really depends on the context. But here, when you look at what Moreno-Gadoy actually said, right, Moreno-Gadoy and Alcazar agreed initially that payment was made from the sale of his property. Well, he then said… This is what they said in their depositions, that he wanted the $100,000 to be paid for the legal representation to come from the sale of his cars, watches… He then said that this money should come from one thing, and then he said it should come from another. And it may well be that he was lying, that this money should come from terrorist-paid money, because of which… When that comes out, that money would ultimately then be forfeited to the government. But in terms of whether he gave an order to pay money that was his, why isn't that enough to get by this first step so that your client doesn't have a right to keep it? Because in this situation, he didn't present any admissible evidence. He didn't present any admissible evidence that this money actually belonged to him. If I tell somebody to pay money, that isn't evidence that that is my money that was used? At least evidence for the jury can turn down, but why isn't that evidence? That's not what was said here, Your Honor. What was said here was, I want you to sell my property. He said, I want you to sell my things, my jet skis, and my cars, and my watches, to pay for this representation. In other words, I want my money used for representation. And then they didn't do what he said, maybe, or maybe they did. Who knows? But why isn't it enough that I say, I want something done with things that are mine to pay for this person? Why isn't that enough? I mean, leave aside all that's going on in this peculiar case. But just as a matter of ordinary thing, if I tell somebody to pay money that is mine, to use my money, why isn't that enough evidence that money that was mine was used? I mean, I think – and I'm going to keep coming back to this because that isn't exactly the context here. What he said here was, I want you to sell my things to pay for this representation. However, he was not – Well, I suppose on this point, you have the point that the money was paid for Alcazar's representation as well, and it was paid by Alcazar's wife, right? So it's not clear that the order to give the money was made by Moreno-Godoy. I'm sorry, Your Honor. Can you repeat that? I missed the first part of that. So the money here was paid by Alcazar's wife for the representation of Alcazar and Moreno-Godoy, right? Yes. Jabal, his wife, Radha Jabal, transferred the money. So she was actually a recipient witness of that transfer. However, as you may recall, she testified – I'm sorry? Wasn't the retention letter by both Godoy and Alcazar for Mr. Cartagena? Yes, it was. On the other hand, what about this other theory that we have the O'Connor Declaration, and we have Moreno-Godoy's testimony that he had earned wages that were being held for him by Alcazar, and so therefore the money was paid out of that? Well, because Moreno-Godoy didn't actually testify to that. So if I can address Moreno-Godoy and what he said and then what Rodriguez O'Connor said. And so Moreno-Godoy's testimony was that he wanted this legal representation paid for from the sale of his property, as I said before. He and Alcazar agreed in their depositions that Moreno-Godoy did not earn a salary and instead was compensated in room and board. There's no suggestion in his deposition, in either of their depositions, that either Alcazar or Alcaport retained any undistributed salary on behalf of Moreno-Godoy. But it was because they weren't recipient witnesses of the transfer of the property or any sale that they couldn't testify as to ownership. So that's why, no, that is not sufficient to get over the bar and demonstrate ownership for the purposes of summary judgment. Now, going to Rodriguez O'Connor, and you pointed out some of this earlier on, his affidavit was properly disregarded. He ceased working for Alcaport two years prior to the transfer to Cartagena. So he had no personal knowledge of the transfer or if Moreno-Godoy retained any entitlement to any funds from Alcaport at that time. Also, the affidavit doesn't show that he was competent to testify about what Moreno-Godoy earned. The statement that he made that Moreno-Godoy would have earned more than $100,000 for his services to Alcaport at best is conclusory. And it's unsupported by reference to any bank statements that he may have reviewed. He doesn't reference any pay stuffs he reviewed, no tax records. He doesn't say where the funds actually were held. He doesn't even say how much Moreno-Godoy earned or the basis for his earnings. In fact, the statement itself that he would have earned more than $100,000 is couched as, frankly, a guess. And conclusory statements such as that in an affidavit can't support summary judgment. Well, here's that statement. And then in the deposition, Moreno-Godoy says, just keep it. If I need anything, I'll ask for it, judging that maybe he was holding money. And then we have Habal saying that Alcazar told her that it was his money, which I understand might be hearsay. But it suggests that maybe Alcazar could testify to the source of the money. So why doesn't that mean that we have at least a factual dispute as to where the money came from? Well, first off, I mean, we've already agreed, I think, that opposing counsel already stated that Habal's testimony is hearsay. She's relying on a statement by Alcazar, which is, frankly, inconsistent with his own statement in a deposition. So it's hearsay. I think what Moreno-Godoy is hoping is that the court will simply throw up its hands and says, who knows? Why don't we just give the money to Moreno-Godoy? And fortunately, Judge Engelmeyer was more diligent than this. Can I ask a question just about Stavis and the partnership law? So if it were shown that Stavis took the money without – of a client who did not want to give it to him, why wouldn't that count as a wrongful act or misconduct so the partnership laws would not shield him from liability? I understand you dispute the merits question, but I'm just – so if it were true that he was not entitled to this money because he was representing Alcazar and Moreno-Godoy pursuant to a flat fee agreement and he wasn't entitled to the $200,000, why would taking $100,000 over the protest of the client not count as a wrongful act or misconduct? Well, first off, we dispute that that is actually what happened, and so I hope you'll – I understand that, but if that were the theory, I think you might agree that that would be a wrongful act or misconduct. I mean – It depends on the merits of the question, what you were saying earlier about whether he actually performed the contract with Cardiganers. Right. I mean, I think it's worth mentioning here and perhaps even worth emphasizing that these allegations of malpractice against Roger Stavis, this isn't the first time that these have been raised against him in this case, and these particular allegations were already litigated and rejected in Moreno-Godoy's habeas petition. And it's also worth emphasizing that the First Department Disciplinary Committee already looked at this, Your Honor, and found no wrongdoing by Mr. Stavis. I understand that. I'm just curious about this. Unlike any of the cases cited by Moreno-Godoy, Roger Stavis was found by the Disciplinary Committee to have not engaged in unethical conduct, unlike in any of those cases. So all those cases are distinguishable. Okay. Thank you very much. Are there further questions from the panel? No. Hearing none, thank you, Mr. Foley. Let's hear from Mr. Robinson. Thank you, Your Honor. This is David Robinson for Stephen R. Cardiganer. Excuse me. I'll be very brief for two reasons. Well, first, that I have ceded a good portion of my time to Mr. Foley, which I thought was appropriate under the circumstances that I think Your Honors are probably aware of, which is that in view of the common issue on the breach of contract claim, at least as relates to Mr. Cardiganer, since that is the only claim asserted against him, I recognize that there are equitable claims asserted against GDB, which were not asserted against Mr. Cardiganer. But nevertheless, Judge Engelmeyer recognizes that in view of the common issues, it would make sense perhaps for Mr. Cardiganer to simply adopt the arguments that were being asserted by GDB. And in fact, that's what we did throughout the summary judgment process. And then now on the appeal, basically we have continued with that, and as I'm sure you've seen in our brief, in accordance with Federal Rule 28-I, adopted those portions of the brief that relate to the issue upon which Judge Engelmeyer makes his decision, that is, the inability of Mr. Moreno-Godoy to demonstrate that this was his money, and therefore the inability to establish a breach of contract claim. And therefore, I have really nothing to add to what Mr. Foley has said. I might just take a minute or two just to quickly run through one or two things on issues relating to Mr. Cardiganer. And I would start in the appellant's brief on page 22. They cite a leisure time travel case. And they say that, well, as that case says, that if Mr. Cardiganer were to be excused from performance under the contract, well, that would result in unjust enrichment, because then he would get to keep the benefit of the contract without having had to perform. But that is clearly and indisputably not the case. It is undisputed here that Mr. Cardiganer did not retain or keep any of that $100,000. There's one and only $100,000 involved in this case. Excuse me. Are you re-arguing the position of a previous person, or are you there to argue that your client is not liable in any event? Because we've heard plenty of argument on the first. It's the second that I thought you were getting 10 minutes for. And on that, I take it your argument has to be that because it is a limited partnership, you are not liable in a joint master-servant, mutual master-servant situation, but you are only liable if you did something wrong, and you claim that there is no evidence of that. Is that what you're here to argue? Because if you are, that's what you should be arguing. I don't represent Mr. Stavis. I represent Mr. Cardiganer. I'm not getting into at all the question of Mr. Stavis and whether he did anything wrong and the partnership issues and so on. I think you were saying it's obvious that Mr. Cardiganer did not retain the money, but he didn't return it to the client either. He just transferred it to Mr. Stavis when it seems that the clients wanted it back so they could retain another lawyer. So why – I mean, certainly the fact that he couldn't perform under the contract is one thing, but he certainly could have returned the money, could he not have? Well, yeah, and I think – and we cite the case law that says that he returned it to Mr. Stavis and GDB, who are the agents for the party from whom he received the money. And I don't think there's really any dispute on that. We cite case law and don't see any in opposition that lawyers are agents for their clients and that, therefore, it was proper and permissible for Mr. Cardiganer to return that money to Mr. Stavis and GDB. And why if I hire a particular lawyer and that lawyer cannot serve, is it appropriate for that lawyer to give money to another lawyer who is doing something else for me? Because Mr. Cardiganer received the money from Mr. Alcazar and the instructions were, return the money to the third party from whom you received it. So he returned it to Mr. Alcazar's agent. That's what he did. And I argue that that was appropriate, that you can return the money to an agent for the party to whom you were supposed to be returning the money. And finally, just one minute on the question of the security clearance and whether Mr. Cardiganer should have known that there would be a problem that he would get denied. Appellant cites two security clearance cases and they're very different. The 2014 case involved a situation where the applicant lied in his security clearance application. The 2002 case, the applicant had, quote, a history of not meeting his financial obligations as well as an inability or unwillingness to satisfy his just debts. Now, there's nothing in the records to show that that was Mr. Cardiganer's situation, that he had an unblemished record in all respects, other than the fact that, yes, he did owe some back taxes. And that's all that's in the records, owed some back taxes to the IRS. And that, therefore, it was not unreasonable for him to think that that would not necessarily stand in the way of him getting a security clearance. So I say that the cases cited by Appellant, as I just described, are really quite different and that, therefore, Mr. Cardiganer should be excused from performance for all the reasons that I've just gone through very briefly. So on your first argument that the money went to Stavis as the agent for Alcazar and Moreno-Godoy, is this right? So Mr. Cardiganer gave the first $90,000 to Stavis. He hadn't contacted Moreno-Godoy or Alcazar about whether that's what he should do. But I understand that you're saying he thought that Stavis was their agent. But then he gave the last $10,000 after Moreno-Godoy and Alcazar had both said the money should go back to Habal. Isn't that right? I'm not sure. I think I'm aware of the same terminology of the third party from whom you received it. I'd have to check to see the exact timeframe there. Okay. Okay, Mr. Robinson, let me ask if any of the members of the panel have further questions. If not, then thank you very much, and we'll turn back to Mr. Tansky on rebuttal. Thank you, Your Honor. In addition to answering any further questions from the panel, I would like to address three points that were discussed during Mr. Foley's argument and one that was discussed during Mr. Robinson's argument. So starting first with Mr. Foley's argument, Judge Calabresi asked about whether it's sufficient to get to the jury to have testimony from Mr. Moreno-Godoy that the money was his. He had money, that he requested that money be sent to Mr. Cartagena, and that the money was in fact sent to Mr. Cartagena. And that is absolutely enough to overcome summary judgment. And the brief analogy I'd like to give is if I go up to the teller in a bank and I say I have an account here and I'd like to withdraw $100, and the teller goes in the back and comes back with $520s and gives them to me, I don't know specifically whether the teller got that money from my account or somewhere else. But it's enough if I'm testifying that it's my money based on that circumstantial evidence to get to a jury on whether that money belonged to me. And that's essentially the same situation we have here. Second, I'd like to address some questions from Judge Calabresi and Judge Cote about the issue of a third-party beneficiary. And Judge Cote asked the question, who engaged these lawyers? And the answer is that both lawyers, Mr. Stavis and Mr. Cartagena, were engaged jointly by Mr. Moreno-Godoy and Mr. Alcazar. And so that answers, I think, Judge Cote's other question about whether we had argued third-party beneficiary status below. We did not. The reason we didn't is because Mr. Moreno-Godoy is not a third party. He's a first party. And so instead, we argued the case law and the principles of contract law that say that if consideration comes in from a third party, so if, for example, this money belonged to Ms. Habal and not to Mr. Moreno-Godoy as a first party, the first party can still enforce the contract. It's still valid and it's still enforceable. And I think it's a good analogy to the third-party beneficiary situation, but we're not relying on third-party beneficiary law. We're relying on first-party beneficiary law because Mr. Moreno-Godoy is a party to both of the engagement agreements. Third, I would like to address a point about the possibility that this money might belong to someone other than Mr. Moreno-Godoy. And I'm going to make two points here. First of all, nobody has argued – or I'm sorry, there's no evidence in the record. Nobody has testified that the money belongs to anybody other than Mr. Moreno-Godoy. The three people who would have standing to claim an interest in the money, Mr. Moreno-Godoy, Mr. Alcazar, and Ms. Habal have all said that the money belongs to Mr. Moreno-Godoy. And even though Ms. Habal's testimony on that point was ruled hearsay, I do think it would be admissible for the purpose of showing that she disclaimed any personal ownership over that money. And the second point I'd like to make here, Your Honors, is we argued in our opening brief that there was no evidence pointing the other way. In other words, there was no evidence from which a reasonable jury could find that this money belonged to anybody else. And in response, the Gallat, Dreyer, and Berkey brief acknowledged our argument but relied entirely on a failure of proof on our part. They said, well, there's no evidence that points to it belonging to Mr. Moreno-Godoy either. They never pointed you either in their brief or in their argument this morning to any evidence that could have allowed a reasonable jury to find that the money belonged to someone else. And Mr. Cartagena, as Mr. Robinson pointed out, adopted that brief and adopted those arguments. So we respectfully – Or is it Mr. Moreno-Godoy's burden to make out his claim to show that the defendant was enriched at his expense, meaning he would have to show that the money was his? So, Your Honor, that's exactly where I want it to go. We disagree that he needs to show that the money was his for reasons I've discussed before. I understand, but maybe for the other claims. I'm sorry. Yes. So my point, Judge Monashi, was just this. If we've gotten over that threshold, if we've shown that there is a genuine basis for the jury to find in our favor, and I respectfully submit that we have, then there's nothing that has been argued by any of the defendants on the other side. And so, in fact, summary judgment on liability should have been entered in our favor because they only rely on this point in saying that we have a failure of proof. We don't have a failure of proof, and they haven't pointed to anything that goes their way. And the fourth point that I would like to make in response to Mr. Robinson's argument, Mr. Robinson said that in his agency point, he said, well, the money was received from Mr. Alcazar, and that's wrong. And that shows the fallacy in his agency position. Mr. Alcazar and Ms. Habal are different people. And so even if we accept that Mr. Stavis was an agent for Mr. Alcazar, he was not an agent for Ms. Habal, and he had no standing to speak on her behalf. So, in other words, it may be that Mr. Stavis was somebody's agent, but he wasn't the agent for the principal, Ms. Habal, the person that Mr. Moreno-Gadoy had directed his attorney, Mr. Karthikeyaner, to return the money to. So whatever it is that Mr. Stavis might have told Mr. Karthikeyaner is entirely beside the point because he couldn't speak for Ms. Habal. Unless the panel has any further questions. Did Moreno-Gadoy say to return it to Habal before Karthikeyaner transferred the $90,000? Your Honor, Mr. Moreno-Gadoy's first response, I believe, was on the 7th of February. And I believe that that was after the money had been paid to Gallant, Dreyer, and Berkey. But it's also – I believe that money was paid even before Mr. Stavis allegedly got any sort of authorization to have that money paid to him. He says, I think, that it was February 4th that he spoke to Mr. Alcazar on that issue. He hadn't received instructions from Moreno-Gadoy. And so is it really unreasonable for him to say, well, look, I can't represent you anymore. I don't know what to do with this fee. I'll give it to someone who's representing them. And then they can work out with their attorney who is representing them what should happen to it. I think it's absolutely unreasonable when you're holding your client's money not to wait for instructions from your client about what to do with it. Yes, Your Honor. Okay. All right. Well, thank you very much, Mr. Tansky.  Thank you, Your Honor. And because that is the last argued case on our calendar for today, we are adjourned.